430 A.2d 650

KEYSTONE PRINTED SPECIALTIES COMPANY, INC.,

v.

**Frances FISCHER, Executrix of the Estate of Philip G. Fischer, Jr., Deceased, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 10, 1980.

Filed March 13, 1981.

Reargument Denied June 16, 1981.

Petition for Allowance of Appeal Denied Oct. 7, 1981.

Charles F. Wilson, Scranton, for appellant.

James T. McHale, Scranton, for appellee.

Before WICKERSHAM, VAN der VOORT and LIPEZ, JJ.

LIPEZ, Judge:

This was a declaratory judgment action brought by appellee Keystone Printed Specialties, Inc. (Keystone), to compel appellant to sell to them certain shares of stock, according to an agreement by which Keystone asserted appellant Frances Fischer (Frances) was bound. The court below ordered Frances to transfer the stock to Keystone in exchange for what Keystone claimed was the contractual price, and Frances has appealed.

Since the agreement purportedly was made between Keystone and appellant's decedent, who was a stockholder of Keystone, and since Frances argues that Keystone's corporate secretary should not have been allowed (as he was) to qualify in evidence certain business records showing various of the decedent's statements and actions relevant to this action, we shall first consider whether these records were properly admitted.[1]

The so-called Dead Man's Statute[2] provides, in relevant part:

> Except as otherwise provided in this subchapter, in any civil action or proceeding, where any party to a thing or contract in action is dead, ... neither any surviving ... party to such thing or contract, nor any other person whose interest shall be adverse to the said right of such deceased ... party, shall be a competent witness to any matter occurring before the death of said party ....

The challenged evidence consisted of the official minutes of various meetings of the corporation's directors and shareholders, at some of which the agreement had been discussed by and among the decedent and the other officials and various actions taken with regard thereto. Appellant's position is that the Dead Man's Statute prevents the identification and the qualification in evidence of those records by an

1. The competence of the records is not challenged on any hearsay ground, both sides apparently agreeing that they fall within the exception created by the Uniform Business Records as Evidence Act, 42 Pa.C.S. § 6108.

2. 42 Pa.C.S. § 5930.

otherwise competent custodian who is also a shareholder in the corporation. We conclude otherwise.

The general rule is that " 'a stockholder of a corporation which had contracted with a decedent during his lifetime is not competent as a witness on behalf of the corporation in procuring a claim against such decedent's executor for breach of contract.' " *Broderick Co. v. Emert*, 110 Pa.Super. 327, 333, 168 A. 512 (1933), *quoting Whitehouse's Estate*, 18 D. & C. 558 (1932) *quoting Fritz's Estate*, 17 Berks Co.L.J. 223 (1925). However, this prohibition is applied only to testimony regarding matters occurring before the death of the other party. The challenged testimony, offered by Martin Fischer, Keystone's corporate secretary, was merely qualification of the official minutes of various stockholders' and directors' meetings. These documents subsisted at the time of trial. "Where the existing fact merely tends to prove by implication that the same or a similar state of facts existed prior to the death of the testator, the witness is competent, but where it appears that the testimony necessarily relates to that which existed or took place in the testator's lifetime, the witness is incompetent." *Foster v. Collner*, 107 Pa. (11 Outerbridge) 305, 312 (1884). The testimony at issue in the instant case concerned an existing fact, viz., the books of original entry and therefore was properly heard by the trial court. *Barclay's Estate*, 20 D. & C. 626 (1934); *See also McHenry v. Stapleton*, 443 Pa. 186, 278 A.2d 892 (1971) (identification, by party's widow, of written instruments signed by the party not excluded).

Since we conclude that all evidence before us was properly admitted, we may state the facts of this case.

On December 21, 1965, the outstanding stock of Keystone was owned entirely by Philip G. Fischer, Senior (Philip, Senior), who owned 349 shares, and Philip G. Fischer, Junior (Philip, Junior), who owned 240 shares. Both men were officers and directors of the corporation. On the above date, at a meeting of Keystone's Board of Directors, Philip, Junior, asked that an agreement be devised providing for Key-

stone's purchase of all Keystone stock held by him upon his death. The minutes of this meeting state further:

> After discussion it was decided that the president [Philip, Senior] be directed to inquire into the advisability of the company purchasing an insurance policy in the amount of $50,000 on the life of P. G. Fischer, Jr. for the purpose of this contingency; and if this seemed feasible to proceed to have an agreement drawn up between said P. G. Fischer, Jr. and the company detailing the conditions of this transfer.

A document styled "Stock Retirement Agreement" (Agreement) was then prepared, relevant provisions of which are as follows:

> The purpose of this agreement is to provide . . . for the purchase of the shares in the corporation of a deceased stockholder by the corporation at a price fairly established, and . . . funds for such purchase.

> .    .    .    .    .

### Article 2

> Upon the death of the stockholder, his estate shall transfer, and the corporation shall buy, 200 shares in the corporation then owned by such decedent for the entire proceeds of the insurance policy.

### Article 3

> The corporation, as applicant, beneficiary and owner, has purchased, or will purchase, insurance on the life of its stockholders with The Mutual Life Insurance Company of New York, as follows:

| Amount of Policy | Policy Number |
|---|---|
| $ 50,000 | 901 38 17 [3] |

**3.** This number is incorrect. The policy actually purchased pursuant to the Agreement was, however, in the amount of fifty thousand dollars; this discrepancy, therefore, is of no moment.

## Article 4

On the death of the stockholder, the corporation shall promptly collect the proceeds of insurance on the deceased stockholder's life and promptly pay the total proceeds to the executors or administrators of the deceased stockholder's estate. In return the executors of the stockholders's estate will deliver 200 shares of the Keystone Stock [sic] held by the stockholder at his death.

## Article 5

Upon payment of the proceeds of the insurance policy, the executors or administrators of the estate of the deceased stockholder shall execute and deliver all instruments necessary to effectuate the transfer of 200 shares of stock of the deceased stockholder to the corporation, as of the date of death of the deceased stockholder. Such transfer of the deceased stockholder's shares shall be made free and clear of all taxes, debts, claims, judgments, liens or encumbrances.

. . . . .

## Article 7

This agreement may be terminated, altered or amended by a writing signed by all stockholders and the corporation. Also, it shall terminate . . . at the option of any stockholder, if the corporation, by an officer other than such stockholder, violates any provision of this agreement or in connection with any policy or policies of life insurance, subject to the terms of this agreement, fails to pay a premium within the grace period . . . or assigns, surrenders, borrows against, changes the beneficiary or makes the proceeds thereof payable other than in a lump sum, without the written consent of all living stockholders . . . .

The Agreement was signed, on February 19, 1966, by Philip, Junior, and by Keystone.

Philip, Senior, retired as president on April 3, 1970, although he remained active as chairman of the board of directors. Philip, Junior, was president and treasurer, and

Martin Fischer, his brother, became vice president and secretary.

Pursuant to the Agreement, Keystone had purchased an insurance policy on the life of Philip, Junior, in the amount of fifty thousand dollars. In 1972, Keystone did not pay the annual premium on the policy, and instead borrowed the amount of the premium against the policy. These actions constituted grounds for termination of the Agreement pursuant to Article 7 thereof. On September 6, 1974, after at least one more premium had gone unpaid, and the grace period for payment expired, the insurance company informed Keystone that the policy had lapsed, and that the cash value of the policy had been used, by the insurance company, to purchase a policy of paid-up term insurance in the amount of $47,869.00, which policy was to expire on March 2, 1984. Philip, Junior, then wrote to the insurance company, asking that he be advised of the cash value of the policy. On September 20, 1974, the insuror informed him by letter that the cash value (which was decreasing daily) on that date was $3701.37. Philip, Senior, then instructed the insurance company, in writing, to cancel the policy and to pay Keystone the cash value thereof as of the date of cancellation. Since Philip, Senior, served only as chairman of the board of directors, the company declined to rely on his authorization; accordingly, Keystone, by Martin Fischer, its vice president, wrote to the insuror on October 10, 1974 with the same request. The policy was cancelled as of that date, and the insurance company paid Keystone $3699.25, this amount being the cash value of the policy on that date.

Philip, Junior, died on July 6, 1977. The minutes of a special meeting of the board of directors called one week later noted that no insurance policies had been held on the life of Philip, Junior, at the time of his death. Keystone then tendered fifty thousand dollars to Frances (Philip, Junior's widow and administratrix) and demanded transfer to it of 200 shares of Keystone stock held by the estate. Frances refused, and Keystone filed the instant action to compel the transfer. The trial court found for Keystone and

ordered the transfer, holding that the Agreement provided only that Keystone was to tender the sum certain of fifty thousand dollars in exchange for the stock. Frances argues here, as she did below, that the parties, by agreeing to, and carrying out, the cancellation of the insurance policy on the life of Philip, Junior, mutually rescinded the Agreement. We agree.

■ The Agreement, clearly, does not provide for the payment of any certain amount of money to the estate. Article 2 thereof states only that Keystone will buy the stock "for the entire proceeds of the insurance policy." Articles 4 and 5 speak only of payment of insurance policy proceeds, and not of any sum certain. We may reasonably infer, from the above-quoted language of the Agreement's preamble, that the purpose of the provision requiring Keystone's purchase and maintenance of an insurance policy on the life of Philip, Junior, was to provide a fund for the stock repurchase; the parties' elimination, by the consent and with the knowledge of all of them, of the source of that fund, therefore, evidences their intent that the Agreement no longer be carried out. Keystone would have this court, in effect, strike from the text of the Agreement the words "the proceeds of the insurance policy" and write in their place the words "the sum of fifty thousand dollars." To hold, as Keystone wishes, that the Agreement is enforceable as thus changed would be to remake the contract with respect to its parties; this a court may not do. *Cumberland-Perry Area Vocational-Technical School Authority v. Bogar & Bink*, 261 Pa.Super. 350, 355, 396 A.2d 433, 435–36 (1978).

■ During the trial, Keystone introduced evidence tending to show that its financial position was better at the time of the death of Philip, Junior, than it had been when the Agreement was signed. Keystone argues that this is proof that the Agreement's requirement that proceeds of a specified policy of insurance be used to fund the stock purchase was contingent upon Keystone's having no other monies available for that purpose, and that a substantial unrestricted surplus allowed the cancellation of the policy with no

concomitant deleterious effect upon the agreement. This position is meritless. The Agreement is not at all ambiguous regarding the purpose or use of the insurance proceeds; evidence purporting to explain these contractual provisions is, therefore, contradictory thereto and, being parol to the contract, will not be considered.

Since the parties' conduct caused the abrogation of the Agreement, there is, as a matter of law, no basis on which to compel the administratrix to transfer the stock.

The Order and Judgment of the court below are reversed, and judgment is hereby entered in favor of appellant.